RAGAN v. DONOVAN et al.

(District Court, N. D. Ohio, W. D. March 11, 1911.)

No. 1,330.

1. BANKRUPTCY (§ 166*)—PREFERENCE BY BANKRUPT—KNOWLEDGE OF PARTY.

The cashier of a bank, and through him the bank itself, for whom the cashier acted in receiving deeds from a debtor in which the consideration was not fixed at a fair valuation of the land conveyed, but apportioned to cover indebtedness to the bank, are chargeable with knowledge of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

debtor's insolvency, where the cashier knew that all of the debtor's visible resources were being exhausted in the transaction and knew of other transactions with the bank out of which liability to the bank would in all probability come against the debtor, and he made no inquiry as to mortgages which were then on the lands he took, nor as to other indebtedness of the debtor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

2. Bankruptcy (§ 163*)—Preferences by Bankrupt—Transfers of Property.

Where the cashier of a bank received deeds from a debtor of the bank with the understanding that they were not to be recorded, but to be held as security, that the debtor was to continue in possession and manage the property as his own, and, as he sold them or otherwise met the pro rata obligation of the note secured, the deed for the particular parcel was to be returned, and this situation continued for five years, during which time the debtor sold some of the parcels and was permitted to make his own deed and to receive back the corresponding deeds he had made to the cashier, and the deeds were at all times in some measure under the control of the debtor, the judgment of a special master that the deeds were held by the cashier for the bank to secure preferences to the bank was proper.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 163.*]

3. Bankruptcy (§ 165*)—Preferences by Bankrupt—Transfers of Property.

Where a debtor gave deeds to a cashier to secure a note to the bank, and, the debtor being jointly indebted to the bank with two cotenants, who were attorneys of the bank, on another note, a readjustment was made five days after the deeds were given, by which the debtor gave a new note for an increased amount including an indebtedness of the debtor or his cotenants, the character of the original transaction as a preference by the debtor is not affected by the readjustment five days later.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

4. Bankruptcy (§ 161*)—Preferences by Bankrupt—Time of Giving Preferences—Delay in Recording Deed—"Required."

By General Code of Ohio, § 8543 (Rev. St. 1908, § 4134), providing that unrecorded deeds, as to bona fide purchasers for value without knowledge, are void, record of deed is "required" within Bankruptcy Act July 1, 1898, c. 541, § 60 (a), 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), providing that a person shall be deemed to have given a preference, if, being insolvent, he has, within four months before the filing of the petition, made a transfer of property, and the enforcement of the transfer will enable one creditor to obtain a greater percentage than other creditors of the same class, and that the period of four months shall not expire until four months from the recording or registering of the transfer, if by law such recording or registering is required.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. § 161.*]

5. Bankruptcy (§ 161*)—Preferences by Bankrupt—Time of Giving Preferences—Record of Deed.

For the purpose of determining whether a transaction was within four months of the filing of the petition in bankruptcy, deeds which were placed in the possession of the grantee with the understanding that the grantor could pay his indebtedness and have the deeds returned to him

were not delivered, and did not become effective, until they were filed for record.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. § 161.*]

Action by James P. Ragan, trustee in bankruptcy of Richard W. Cahill, against Dennis D. Donovan, as assignee for the benefit of the creditors of the Citizens' State Banking Company, and others. Heard on the report of a special master for the complainant. Findings and report of the special master approved and made the order of the court.

J. R. Linthicum and W. W. Campbell, for plaintiff.

E. N. Warden, Julian H. Tyler, and Smith & Beckwith, for defendants.

KILLITS, District Judge. This is an action by the trustee in bankruptcy of Richard W. Cahill against the assignee of the Citizens' State Banking Company of Napoleon, Ohio, and others, to avoid certain deeds of real estate of Cahill to the bank, as preferences. The special master, to whom the issue was referred, reports for the complainant, and the case is before the court on review.

January 7, 1904, Richard W. Cahill was clearly insolvent. He had title to real estate of the value of less than $30,000, as we think the clear inference is from the testimony, incumbered by mortgages and other equities approximating $4,000 or $5,000. This was all his visible property. He was indebted to the Citizens' Banking Company directly in the sum of $30,872, being in the shape of past-due notes and accrued interest thereon, and had other contingent indebtedness to the bank. He owed his joint tenants in one of the parcels of realty, Donovan (who is the same Donovan now assignee), and Warden, who were then partners in the practice of law and attorneys for the Citizens' Banking Company, more than $2,000, in order to give him a full undivided one-third interest in the parcel of realty referred to.

On the 7th of January he gave to the Citizens' Banking Company a note for $30,872, to replace the past-due notes and accrued interest, and, contemporaneously therewith, executed four separate deeds to the several parcels of realty in which he had the whole or an undivided interest, running to Groll, who was then the cashier of the bank. In determining what considerations should be placed in these several deeds, the effort was not to make a statement of the fair value of the lands conveyed, respectively, but to apportion to the several parcels a fair share of the indebtedness evidenced by the new note, and in that way the aggregate consideration was made to be $30,800.

It is very plain from the testimony that the amount of these considerations exceeded materially the actual value of the land; some of the parcels subsequently selling for less than the consideration placed upon them in the deed.

[1] It is not a difficult matter to charge Groll with knowledge of the insolvent condition of Cahill at the time these deeds were made, and whatever knowledge, actual or constructive, Groll then had, is, of course, chargeable to the bank and to the defendant assignee. Not

only did Groll join, as his testimony shows, in an exaggerated value upon these separate parcels of land in the statement of consideration in the several deeds, which even then did not reach the amount of the indebtedness under consideration, but he knew that all of Cahill's visible resources were being exhausted in the transaction; he knew of other transactions with the bank out of which, in all probability, liability to the bank would come against Cahill; and, as cashier of the bank at which Cahill dealt extensively, he must have had some familiarity generally with Cahill's condition. In fact, in the testimony Groll says that he knew that the property would not meet Cahill's indebtedness to the bank by several thousand dollars, and that he made no inquiry whatever as to mortgages which were then on the lands he took, nor any inquiry of Cahill as to other indebtedness, although all the circumstances of the transaction unmistakably suggest that this business man was placed upon inquiry, and that that inquiry, if honestly met, would have shown the hopeless condition of Cahill's finances there can be no question. The doctrine of inquiry and the responsibility to inquire is too well settled to require citation of authorities. We think the special master was clearly right in ascribing to the bank, through Groll, knowledge on the date referred to that Cahill was insolvent.

[2] The deeds were given to Groll at this time with the understanding and agreement between the parties that they were not to be recorded, but to be held by Groll as security only for the note; that Cahill was to continue in possession of the several parcels, manage them as his own; and, as he sold them or otherwise met the pro rata obligation of the note as to any particular parcel, the deed for such parcel was to be returned. This situation continued for five years. In the meantime Cahill sold one or more parcels; was permitted by Groll, and the bank through Groll, to make his own deeds and to receive back again the corresponding deeds from the bank on the application of the proceeds of sale to the bank's indebtedness.

Circumstances show plainly that not only were these deeds not to be considered to be deeds absolute, but that they were in some measure always under the control of Cahill, and the whole situation renders inevitable the judgment that they were held by Groll for the bank to secure preferences to the bank, and we sustain the special master's judgment in that behalf.

[3] Donovan and Warden and Cahill at the time were jointly indebted to the bank on a note of $4,000. Cahill, on computation, was found to owe Donovan and Warden $2,184.11 in order to make him a. one-third owner in one of the parcels involved in these deeds. This condition of affairs brought Donovan and Warden (whose relation to the bank as the bank's attorneys must not be overlooked) together with Groll and Cahill on the 12th of January, 1904, at which time a new note was made by Cahill to the bank for $34,088.64, the note made five days previously being surrendered, and Donovan and Warden were given credit on the $4,000 note, as against Cahill, for $2,184.11, which sum was part of the difference between the old and the new notes. The assignee claims in this transaction the benefit of a new consideration for these deeds to the amount of $2,184.11, assuming that that circum-

stance will avoid the weakness of the bank's position resulting from the fact that the former note, made contemporaneously with the deeds, was in fact for an antecedent indebtedness.

This court is satisfied that the assignee has not the right to rely upon the transaction of January 12, 1904, for such purpose. There is no question at all but that Cahill, and Groll, for the bank, committed themselves to the situation as it was on the 7th of January, 1904, and that the verbal understanding between all the parties five days later, after the former transaction was complete, out of which Donovan and Warden, the bank's attorneys, received a preference against their failing companion at the expense of the bank, should not be permitted to improve the condition of any of the parties at the expense of subsequent creditors of Cahill, whose equities against the bank are manifest, as will subsequently appear. The court is aided to this conclusion very materially by reflection upon the relationship which Donovan and Warden sustained as attorneys for the bank to this transaction. Neither Groll, for the bank, nor the bank's attorneys, can claim an advantage, we think, under the circumstances, out of this affair. At any rate, the deeds under attack in this case were not made in contemplation of the situation developed on the 12th of January, 1904, but as the parties arranged matters five days previously.

[4] January 2, 1909, the Citizens' State Banking Company made an assignment to Dennis D. Donovan, who, on the 4th of January, 1909, placed on record two of the deeds executed as above stated on the 7th of January, 1904 (the other two having been quietly returned to Cahill under the agreement referred to), and a third deed dated the 30th of November, 1908. This latter deed was from Warden and wife to Groll, Warden having held in trust for himself, Donovan and Cahill one of the parcels involved in the first transaction, the early deed whereof had been returned to Cahill and some of the lands described had been sold, this deed having been given to Groll simply to carry out the original agreement and to correct an oversight.

May 1, 1909, less than four months after the filing of these deeds, an involuntary petition in bankruptcy was filed in this court against Cahill, and these three deeds are the ones that are attacked in this court as preferences, as above stated.

The schedule in the bankruptcy proceedings charges Cahill with $106,063.65 of liability, including $32,500 indebtedness to the Citizens' State Banking Company, and ascribes to him assets nominally of the value of $74,527. The assets are shown, however, to be of little, if any, value, except the real estate. Cahill scheduled as his own property the same real estate involved in these deeds, but stated that they were subject to deeds of trust to the Citizens' Banking Company to secure obligations which are in fact new notes made by Cahill at various times subsequent to January, 1904, to take up the note made January 12, 1904, for $34,088.64.

A consideration of Cahill's liabilities is highly illuminative and instructive as to the equities of this case. The citizens' State Banking Company appears to be a creditor for the following sums: $30,988.82 on notes secured by the so-called deeds of trust: $35,000, on which

Cahill is liable as stockholder and indorser with four other persons, against which is hypothecated Cahill's interest in the Napoleon Manufacturing Company, a bankrupt corporation, the interest being 404 shares of stock scheduled at a nominal value of $40,000 and of no actual value; $15,577.69, on which he is liable as indorser for the defunct Napoleon Manufacturing Company, with four other persons; $2,379, liability on a note with one surety; for $1,255.89, on open account. All of these liabilities were incurred during the time that the bank, through Groll, was secretly holding these deeds to all of Cahill's real estate, over which Cahill was exercising publicly the absolute dominion incident to unrestricted ownership. Surely, the several persons who went to the Citizens' State Banking Company and involved themselves in these heavy liabilities on Cahill's paper have a forceful equity against the representative of the bank that permitted Cahill to masquerade to the world as the owner of a large amount of real property and thus a reasonably safe man with whom a joint liability might be incurred.

In addition to these liabilities, during the time that the bank, through Groll, was thus keeping these deeds off record, Cahill incurred liability with divers persons for money borrowed and for indorsements obtained amounting to. more than $12,000, and the circumstances suggest that either the bank, through Groll, its cashier and manager, knew of his involving himself to this extent also, or was willfully and purposely blind to conditions which eyes but reasonably open might have seen.

The court is justified, we think, in holding that the interpretation placed upon the language of section 60, paragraph (a), read in connection with section 3, paragraph (b), of the bankruptcy act, by the cases of English v. Ross (D. C.) 140 Fed. 630, Loeser v. Savings Deposit, Bank & Trust Co., 148 Fed. 975, 78 C. C. A. 597, 18 L. R. A. (N. S.) 1233, and In re Beckhaus, 177 Fed. 141, 100 C. C. A. 561, should be applied to a transaction where deeds of realty are involved, as in this case, and that we should hold that the preference, manifestly attempted in behalf of the bank, should be referred for date to the time of filing the deeds.

The law applicable to this situation (section 60, paragraph a, of the Bankruptcy Act) reads:

"A person shall be deemed to have given a preference, if, being insolvent, he has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of recording or registering of the transfer, if by law such recording or registering is required."

The cases cited above (In re Beckhaus and Loeser v. Savings Deposit, Bank & Trust Company), to be sure, deal with unrecorded chattel mortgages. In the latter case, the gist of the decision is stated in the first paragraph of the syllabus as follows:

"A state statute which requires a conveyance or transfer to be recorded in order to be effectual against any class or classes of persons is a law by which such recording is 'required,' within the meaning of Bankruptcy Act July 1, 1898, c. 541, § 60a, as amended by Act February 5, 1903," etc.

Commenting upon the reasoning of the Court of Appeals in the Loeser Case, the Court of Appeals of the Seventh Circuit, in Re Beckhaus, supra, say.

"The primal canon of statutory construction is that the language actually used be given its full and fair meaning, that unqualified words be taken without qualification, and that in the absence of ambiguity extraneous matter be not considered. Under this canon probably nothing more can profitably be said than, if recording is required, it is required. If required for any purpose, or without purpose, how can it be said to be not required? If recording be not required, unless required for all purposes, it could never be said to be required where the instrument is valid between the immediate parties without recording."

And the court proceeds to say that any other ruling than that, when recording is required for any purpose or to protect any class of persons, it is "required" under section 60a, is to work positive injustice.

Chattel mortgages in Illinois, in which state this case was decided, as in Ohio, where the Loeser Case was decided, need not be recorded as between the immediate parties, but as to some classes of persons recording is essential to their validity.

Section 8543, General Code of Ohio (Rev. St. 1908, § 4134), provides that unrecorded deeds, as to bona fide purchasers for value without knowledge, are void; that is to say, for some classes of persons deeds are required to be recorded, and as to other classes they are valid without record. Then adopting the reasoning of the Court of Appeals in the Beckhaus Case that, recording being required for some purpose, recording is "required" under this statute, it seems to us that the application of these authorities to this situation is too clear to need further argument, which might be well grounded upon the case of English v. Ross, supra.

The effect of this is to deprive the case of Kemper v. Campbell, 44 Ohio St. 210, 6 N. E. 566, of application, because the case at bar is affected peculiarly by the provisions of the bankruptcy law, construed as we find it by the cases cited from the Federal Reporter.

There are, moreover, such vital differences between the facts in Kemper v. Campbell and in the case at bar that that case might perhaps be disregarded, even if the construction we place upon the bankruptcy law did not compel that course. It would seem to be a fair position to take that one who assumes to receive to himself what he intends to have no other effect than a mortgage should be held to the incidents of a mortgage, and that one ought not to be permitted, in the face of equities such as exist here, to claim, in one breath, that his papers were but mortgages, and, in the other, that, although they were mortgages, he was entitled to the safeguards surrounding absolute transfers.

In Kemper v. Campbell, a deed, absolute in form, intended, however, to secure the payment of money due from the maker to the grantee, and which the court said need not have been recorded to give

it prevalence over a subsequent assignment for creditors, was given, for the greater part, for a new consideration passing from the grantee to the grantor. It was off record for two months, and no question at all arose as to the good faith of the transaction or that any creditor became such upon the faith of the apparent ownership of the property by the grantor. The court in its opinion says (page 214 of 44 Ohio St., page 567 of 6 N. E.):

"It is not a proper mortgage. In equity it is construed to be such for the purpose of preventing imposition and injustice; but at law it is simply, what on its face purports to be, an absolute conveyance in fee simple. And no other or different construction will be placed on the deed, unless necessary to accomplish the ends of justice. To do otherwise would be foreign to the spirit of equity, and would violate the plainest principles upon which equity jurisprudence has always been administered by the courts. No one of the maxims of equity is of more unvarying application than that 'he who seeks equity must do equity.'"

We commend this language to the parties and counsel in this case. To give Kemper v. Campbell the effect claimed for it by defendants would be, under the circumstances of the case at bar, to work out instead of to prevent "imposition and injustice." The bank, through the assignee, in this instance is not here doing the equity it seeks.

[5] If, however, we are wrong in so applying the cases cited above, and it is not the law that an unrecorded deed is subject to the treatment we have attempted for the deeds involved in the proceeding before us, there is another reason why, in the judgment of the court, the special master was right in his report in favor of the complainant.

Groll testifies that these deeds were to be severally handed back to Cahill as Cahill redeemed them, either by selling the property conveyed by them, respectively, or by otherwise meeting the obligations against which they were ratably applied. Mr. Warden, testifying as a lawyer, is not willing to state the matter the same way. His testimony is:

"It was understood at the time that Mr. Cahill could pay his indebtedness and have the property retransferred to him at any time within a reasonable time. That was the understanding and intention of Mr. Cahill there."

However, and without at all suggesting that Mr. Warden's generalization just quoted manifests an intention to testify other than truthfully, the circumstances suggest very clearly that the arrangement was as Groll repeatedly says, for that was the arrangement that the parties acted upon. It was not deemed necessary when Cahill effected a sale of the most important property to Armbruster and Vajen that the title should be retransferred to Cahill; but he was permitted, with the knowledge of all of the parties, to make deeds to these people as if his title was unaffected by the deed lying in the possession of the bank. And as to one other parcel, when a portion of it was sold, the deed in Groll's possession, representing the whole parcel, was actually handed back. There are other circumstances which support the conclusion that these papers, although in Groll's possession, were not by the parties considered to be effective to transfer title from Cahill to Groll.

The facts raise the question of whether delivery such as is necessary to effect a transfer of property was ever made. If it were understood by maker and grantee that the title to the grantee was not actually passing with the possession of the deeds in the grantee, but that those apparent muniments of title were subject to the informal recall of the grantor up to the time that something else was done, to wit, recording by the grantee, in order to finally effect the purpose of the instrument, then we deem it to be clear that the delivery did not become effective until the grantee did the final act which would give the instruments complete effect.

Delivery may be accomplished in many ways, and without formality; but it is not concluded until there results from it final and absolute transfer to the grantee of the rights of which the instrument speaks. It is true that, unexplained, mere tradition of a deed from the maker to the person to whom it is made or to some person for his use suggests delivery, and this is so because of the presumption that the instrument is taken by the receptor for the purposes of its execution. But this is presumption only, overthrown if it is plain that in the tradition either the grantor is not intending to part with the title described in the deed, or that the receptor is not exercising acceptance of the title as passing out of the grantor to him. The criterion of a delivery, in whatever form, is that through it the grantor absolutely parts with control of the instrument. That both Cahill and Groll considered the latter's holding of each of these deeds to be subject to the former's recall is, as we have said, clearly the evidence. Delivery, therefore, was not complete and effective until some act was done which was within the contemplation of the parties and which ended Cahill's dominion over the papers. That act was to file them for record, which was an evenuality clearly within the plans of the parties when they were made. Then only was there delivery.

If this position is tenable, then the preference which Cahill unquestionably undertook to make to the bank and the bank undertook to obtain, on the 7th of January, 1904, was not completely effective until the 4th of January, 1909, when the deeds were filed for record which date is within four months of the filing of the involuntary petition.

The findings and report of the special master are approved and made the order of the court.